## MAYO v. DENNIS SHEEN TRANSFER, Inc.

### No. 16857.

Court of Appeal of Louisiana. Orleans.

April 4, 1938.

*Rehearing denied April 18, 1938; writ of certiorari denied May 30, 1938.

Melvin P. Barre, of New Orleans, for appellant.

Deutsch and Kerrigan and Marian Mayer, all of New Orleans, for appellee.

McCALEB, Judge.

Charles Mayo, a negro truck driver, brought this suit against his former employer, Dennis Sheen Transfer, Inc., for workmen's compensation. He charged, in substance, that on October 8, 1936, he was assaulted without just cause by one Arthur Pool, a mechanic in defendant's employ, after a discussion had arisen about his work; that, in attempting to avoid injury at the hands of said Pool, he turned to retreat and that, as he did so, Mr. Lafayette Sheen, the president of defendant company, struck him in the right cheek and eye with a lead pencil, said pencil piercing his cheek and the sclera of his eye. He further alleged that his employment was hazardous; that the injury he received arose within the course of his duties and that, as a direct result of the accident, he has sustained a permanent loss of vision of his right eye, for which he is entitled to 100 weeks' compensation.

The defendant, while admitting the hazardous employment and plaintiff's loss of sight in his right eye, denies liability on the ground that the injury did not occur during the course of plaintiff's work and that Mr. Sheen did not strike him in the manner alleged.

After hearing evidence on this issue, the trial judge found for the defendant and dismissed the plaintiff's suit. Hence this appeal.

The question presented by this record is solely one of fact, i. e., did plaintiff receive his injury while engaged in the course of his employment by the defendant? Before considering the testimony respecting the manner in which the accident is alleged to have occurred (which is in hopeless conflict), it is well to set down certain undisputed facts leading up to the altercation.

On October 8, 1936, the plaintiff was in defendant's employ. His duties were to drive a truck which hauled cotton. This truck was a new one, having been purchased from the White Motor Company by defendant about a month prior to the accident. It is the practice of the defendant company, on purchasing new trucks, to have the same checked over at designated intervals by the mechanics of its vendor and it was part of plaintiff's duties to have the truck inspected whenever defendant directed him to do so. Shortly before the date of the accident, it had been discovered, either by Mr. Sheen or Mr. Pool of the defendant company, that this particular truck had been throwing lubricating oil from out of the crank case, and, in the forenoon of the day in question, plaintiff had been instructed by his superiors to deliver the truck to the White Motor Company to have the defects existing in its mechanism checked. In accordance with these orders, plaintiff drove the truck to the shop of the White Motor Company where it was examined. The result of this inspection disclosed that the crank case of the motor contained an oversupply of oil and that this oil was refuse "fuel" which had been taken out of the motor of another vehicle. Upon learning these facts, one of the employees of the White Motor Company communicated with Mr. Sheen of the defendant company. The latter immediately called at the White Motor Company's shop and, upon being shown a sample of the oil found in

the motor of the truck, concluded that plaintiff was responsible for it presence in the crank case. Mr. Sheen admits that he was, at that time, considerably vexed at the plaintiff. He telephoned Pool, his mechanic, and instructed the latter to fire the plaintiff that afternoon. He also directed an employee of the White Motor Company to send a sample of the refuse oil, found in the truck, to Pool.

Sometime between 5:30 and 6 p. m. that afternoon, plaintiff brought the truck to defendant's yard for storage. He stopped in front of the gasoline tanks on the outside of the premises and had the truck serviced with gasoline by Pool. Thereafter, he drove into the yard and, at that time, Pool questioned him with respect to the refuse oil found in the truck and accused him of placing it in the crank case. Plaintiff attempted to explain where he had obtained the oil and offered to show Pool the tank from which it had been extracted, whereupon Pool started to abuse and curse him and struck at him with a bottle of oil. Plaintiff dodged and successfully escaped this blow but Pool continued to advance and finally threw the bottle of oil at him. Pool missed his mark and plaintiff turned to run.

From this point on the testimony of plaintiff and defendant's witnesses cannot be reconciled.

Plaintiff's version of the incident is as follows: He says that, as he sought to avoid being struck by the oil bottle thrown by Pool, he turned to retreat from the premises; that Mr. Lafayette Sheen was standing just behind him and, as he attempted to break away, Sheen struck him in the eye with a pencil; that he ran from the yard and was followed by Pool who was armed with a hammer; that he proceeded to Montegut street, closely pursued by Pool, who, upon being outdistanced by plaintiff, jumped upon the running board of an automobile which was driven by a Mr. Paul (one of defendant's employees) and that, finally, he eluded his followers on Royal street, where he hid in a warehouse. He further states that, by that time, his eye was paining him severely; that he waited until two or three street cars had passed and then boarded one of these cars and went directly to his home on Rampart street, where he related the facts to his wife and a friend. He and his wife immediately left their home and went to a nearby grocery store where plaintiff was able to borrow carfare from the proprietor and from there they repaired to the Charity Hospital. He says that he arrived at the hospital between 7 and 7:30 p. m.; that, after waiting there for some time, he was attended by a doctor who extracted the pencil from his cheek and lower eyelid and that, later, an operation was performed whereby the lead pencil point was removed from his eyeball.

Plaintiff's testimony as to the happenings after the injury is corroborated by the statements of his wife as well as a friend named Katherine Williams, Mr. Coe, the grocery store proprietor, and the records of the Charity Hospital.

Plaintiff also stated on the witness stand that, when he ran away from the defendant's yard, his face was bleeding and that he held his handkerchief to his eye while in the act of escaping. In this assertion, he is supported by Frank Boyd, a fellow employee. Boyd, sometime after the occurrence of the accident, had given plaintiff's attorney a written statement in corroboration of plaintiff's version of the incident. During the interval between the date of the statement and the trial of the case, Boyd became hostile to plaintiff's cause. He was subpoenaed by plaintiff on several occasions without success and the record reveals that it was extremely difficult to compel his attendance. Finally, he did appear on the date the case was actually tried and was accompanied to court by one Lane, a watchman in defendant's employ. Plaintiff, nevertheless, placed Boyd on the stand as his witness but, as we have pointed out, his attitude and demeanor exhibited plain bias in defendant's favor and it is clear from his testimony that he attempted to injure plaintiff's cause in order to curry the favor of the defendant. However, in spite of his prejudice, Boyd reluctantly admitted that he saw plaintiff when the latter was being chased by Pool and that, at that time, "he was holding his face * * * and he was hollering and groaning. * * *"

On the other hand, Mr. Sheen states that, while he was present and saw the encounter between Pool and the plaintiff, he neither struck the plaintiff with the pencil nor was he near enough to place his hands upon him. He confesses that he was exceedingly provoked at plaintiff and that, if he could have grabbed him, he would have used a far more formidable weapon than a pencil with which to chastise him.

He further declares that plaintiff was not injured when he ran out of the yard and in this statement he is corroborated by the defendant's witnesses Pool and Lane (the watchman).

It is evident, in view of the judgment below, that the trial court accepted Mr. Sheen's denial that he assaulted the plaintiff, as true. We find no error in the judge's holding in this respect and, were this a case where plaintiff was attempting to recover damages against Sheen for assault and battery, the judgment would not be disturbed. However, it must be borne in mind that this is an action for workmen's compensation and it was not incumbent upon the plaintiff to show that his injury resulted from the assault allegedly caused by Sheen but only to prove that his wound was received in the course of his employment as a result of the altercation growing out of it. In our opinion, plaintiff undoubtedly has an honest and abiding belief that Sheen struck him with a pencil and this conclusion is not an unreasonable one when we consider that the affray was violent; that all parties engaged therein were in a heat of passion and that plaintiff knew that Sheen would have done him bodily harm if the latter had been able to grab hold of him. Notwithstanding this, we feel that the plaintiff is mistaken in his deduction that Sheen was his assailant.

Our decision, therefore, must hinge upon the question as to whether plaintiff's injury occurred during the affray. Defendant's counsel suggest that it is probable that it did not because the Charity Hospital report discloses that some one had informed the doctors of that institution that the injury occurred while plaintiff was playing with a pencil. We believe, however, that this suggestion is in discord with the physical facts in that it overlooks entirely the nature of plaintiff's wound, and the short space of time which elapsed between the affray and the plaintiff's admission to the hospital. Plaintiff denies that he ever made such a statement to physicians at the hospital and no one has been produced to offset his declaration on this score. Moreover, to conclude that, by merely playing with a pencil, plaintiff would have jammed it into his cheek with such force that he needed medical aid to effect its removal, would be fatuous. It is more reasonable to deduce that some time, either during the affray or during plaintiff's subsequent escape from Pool, the pencil became lodged in his cheek.

It is not disputed that the defendant company supplies its employees with pencils of the type extracted from plaintiff's eye. If either plaintiff or Pool had a pencil in their shirt pocket at the time of the struggle, it might well have become imbedded in plaintiff's eye when he attempted to ward off the blows Pool sought to inflict upon him.

It is true that Pool, Sheen, and Lane assert that, when plaintiff retreated from the premises, he was not injured. We cannot place much credence in these declarations, however, since it must be remembered that all of these witnesses were highly excited at the time. Furthermore, their testimony is inapposite to that of the unwilling witness Boyd who reluctantly admitted that when plaintiff left defendant's yard he was groaning and that he had his hand to his face.

The dispute between plaintiff and Pool was directly connected with defendant's business. Pool admittedly was the aggressor. Therefore, it is of no moment whether Pool, Sheen, or Lane inflicted the wound or whether plaintiff injured himself accidentally while retreating from Pool's assault, provided the accident occurred while the affray was in esse.

We believe that plaintiff has shown by a fair preponderance of evidence that he was injured while engaged in an altercation with defendant's employee over the company's business. This conclusion, we feel, rests upon a reasonable hypothesis, since we consider that it is highly improbable that the wound was self-inflicted or that the injury occurred during the short space of time elapsing between the altercation and plaintiff's admission to the hospital. Furthermore, this result is fortified by the physical facts of the struggle and the evidence of Boyd and the plaintiff that the latter had already been injured at the time he escaped from defendant's premises.

It is conceded that plaintiff has lost the vision of his right eye and it follows that, under section 8 of Act No. 20 of 1914, as amended by Act No. 242 of 1928 § 1, he is entitled to recover 65 per centum of his weekly wage for a period of 100 weeks. Plaintiff testifies that, at the time of the accident, he was earning 35 cents per hour for a 9-hour day, 6 days per week, or a weekly wage of $18.90. Mr. Sheen, in his testimony, admits that this was the schedule of wages earned by plaintiff but asserts that he did not work regularly for 6 days a week. This proposition has been fully

answered by the Supreme Court in Rylander v. T. Smith & Son, 177 La. 716, 149 So. 434, where it is held that compensation for injuries is properly based on the daily rate of pay rather than the average weekly earnings.

For the reasons assigned, it is therefore ordered, adjudged, and decreed that the judgment appealed from be, and it is, reversed, and it is now ordered that there be judgment herein in compensation in favor of the plaintiff, Charles Mayo, and against the defendant, Dennis Sheen Transfer, Inc., for the sum of $12.28 per week for a period of 100 weeks from October 16, 1936, with legal interest on all deferred payments from due date until paid and for all costs.

Reversed.